# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | Nan R. Nolan |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7345 | **DATE** | 4/25/2003 |
| **CASE TITLE** | For Your Ease Only vs. Calgon Carbon Corp | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Status and ruling on Plaintiff's motion to compel the production of documents. For the reasons stated in the attached Memorandum Opinion and Order, Plaintiff's motion to compel production of documents is granted in part, denied in part, and reserved in part [38-1]. Calgon Carbon is directed to submit documents for in camera review by April 30, 2003. Fact discovery is to close August 29, 2003. Plaintiff(s) will designate any expert witnesses and provide the disclosure required by September 26, 2003. Defendant(s) will designate any expert witnesses and provide the disclosure required by October 27, 2003. Plaintiff(s) will disclose any expert rebuttal opinion by November 28, 2003. Depositions of experts will be taken by and all expert discovery will be completed by January 6, 2004. Status hearing set for June 10, 2003 at 9:30 a.m. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | **Document Number** |
|---|---|---|---|---|---|
| ✓ | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | APR 2 8 2003 | | |
| | Docketing to mail notices. | | date docketed | | 76 |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | | |
| cav6 | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| FOR YOUR EASE ONLY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CALGON CARBON CORPORATION and | ) | |
| PRODUCT CONCEPTS COMPANY and | ) | |
| MARK SCHNEIDER | ) | |
| | ) | No. 02 C 7345 |
| Defendants. | ) | Magistrate Judge Nan R. Nolan |
| | ) | |
| CALGON CARBON CORPORATION | ) | |
| Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FOR YOUR EASE ONLY, INC. and | ) | |
| LORI GREINER | ) | |
| Counterclaim Defendants. | ) | |


DOCKETED

APR 2 8 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff For Your Ease Only, Inc. ("FYEO") seeks, among other things, a declaratory judgment that it is not infringing U.S. Patent No. 6,412,628 held by defendant Calgon Carbon Corporation ("Calgon"), or alternatively that the patent is invalid. FYEO also has claims for tortious interference and unfair competition based on statements allegedly made to FYEO's largest customer by Calgon and defendant Mark Schneider. FYEO now seeks to compel the production of documents withheld by Calgon on the grounds of privilege. FYEO's motion is granted in part, denied in part, and reserved in part.

## DISCUSSION

A document is protected by the attorney-client privilege when: 1) legal advice of any kind is sought 2) from a professional legal adviser in his capacity as such, 3) the communications relating to that purpose, 4) made in confidence, 5) by the client, 6) are at his instance permanently protected 7) from disclosure by himself or the legal adviser, 8) except the protection may be waived. United States v. White, 950 F.2d 426, 430 (7th Cir. 1991). A document may be protected by the work-product privilege if it is created by an attorney "in anticipation of litigation." Fed. R. Civ. P. 26(b)(3); Logan v. Commercial Union Ins. Co., 96 F.3d 971, 976 (7th Cir. 1996). An assertion of work-product privilege may be overcome upon a showing of substantial need, but the courts are cautioned to give even greater protection to attorney opinions which include mental impressions, conclusions, or legal theories concerning the prospective litigation. Id. at 976, n.4. A party that refuses to disclose information based on a claim of privilege bears the burden of establishing that the privilege applies. In re Grand Jury Proceedings, 220 F.3d 568, 571 (7th Cir. 2000) (attorney-client privilege); Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124, 138 (3d Cir. 2000) (work product doctrine).

FYEO raises three main arguments in support of its motion to compel: (1) factual information withheld by Calgon is not privileged; (2) documents disclosed to a third party outside of Calgon cannot be withheld under a claim of attorney-client privilege; and (3) a prima facie case of fraud exists which justifies -piercing the attorney-client privilege. The Court addresses each argument in turn.

## I.    **Factual Information**

FYEO first argues that Document Categories P and GG in Exhibit 1 of the declaration of Deakin T. Lauer which are being withheld by Calgon appear to reflect testing performed on FYEO's products. FYEO states that the parties previously agreed to exchange test results. The privilege log produced by Calgon indicates that the subject matter of the withheld documents is as follows: 1) "test results re: potential infringement of '628 patent by Silver Safekeeper Jewelry Box (QVC #H33954)" and 2) "Email re: testing on potential infringement of '628 patent by Silver Safekeeper Jewelry Boxes (QVC #H53761; QVC #H54187; QVC #H60943; QVC #H63704; QVC #54900; and QVC #33954)." Calgon claims that the attorney-client and work-product privileges protect these documents from disclosure. Calgon also states that it has produced all underlying factual information that is currently relevant to this case, including information related to the accused FYEO products that have been recently added to Calgon's counterclaim of infringement.

Based on the privilege log, it appears that the documents in question were authored by counsel and sent to Calgon employees or authored by Calgon employees and sent to counsel and/or other Calgon employees. However, the description of each document and its contents are not sufficiently detailed to allow the Court to determine whether the elements of attorney-client privilege or work product doctrine have been established. For example, the Court cannot determine whether the communications were confidential and made for the purpose of obtaining or providing legal advice. The Court is also unable to determine from the descriptions whether the documents were created by an attorney in anticipation of litigation. Accordingly, it is necessary for the Court to conduct an in camera review of the documents contained in Categories P and GG in Exhibit 1 of Lauer's declaration to determine whether the documents are protected from disclosure by the

-3-

privileges asserted. Calgon is directed to submit these documents to the Court by April 30, 2003.

Moreover, Calgon does not contest FYEO's assertion that the parties agreed to exchange test results. Test results are not privileged. "The [attorney-client] privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney[.]" UpJohn Co. v. United States, 449 U.S. 383, 395 (1981). FYEO is entitled to discover the underlying test results which are the subject of the documents in question. Calgon is directed to produce any previously undisclosed test results which are the subject of these documents.

## II.    Disclosure of Documents to Mark Schneider

FYEO next seeks to compel withheld documents identified as Document Categories C, D, E, F, N, Q, S, T, U, V, and W which have been distributed to Calgon's co-defendant Mark Schneider ("Schneider"). Calgon asserts that the joint defense and/or community of interest privileges protect these documents from disclosure. FYEO maintains that the joint defense or common interest privilege does not apply and the disclosure of these documents to Schneider waives any claim of privilege that Calgon may have had with respect to these documents.

"The general rule is that material which is otherwise privileged is discoverable if it has been disclosed to a third party." Allendale Mut. Ins. Co. v. Bull Data Sys., 152 F.R.D. 132, 139 (N.E. Ill. 1993). An exception to this rule applies when a third party shares a common interest with the disclosing party which is adverse to that of the party seeking discovery. Id. at 140. This exception is known as the common interest or joint defense doctrine. The "common interest" or "joint defense" doctrine "generally allows a defendant to assert the attorney-client privilege to protect his statements made in confidence not only to his own lawyer, but to an attorney for a co-defendant for a common purpose related to the defense of both." United States v. Evans, 113 F.3d 1457, 1467 (7th

Cir. 1997) (internal quotations and citations omitted). To maintain the privilege, the common interest must relate to a litigation interest, and not merely a common business interest. <u>Medcom Holding Co. v. Baxter Travenol Labs., Inc.</u>, 689 F.Supp. 841, 845 (N.D. Ill. 1988). The burden of demonstrating the existence of a joint defense agreement falls on the person claiming it. <u>Ocean Atlantic Development Corp. v. Willow Tree Farm</u>, 2002 WL 649043, *5 (N.D. Ill. April 19, 2002).

Calgon has produced a joint defense agreement executed March 6, 2003. The agreement states an effective date of October 11, 2002, the date that the present action was initiated. The agreement also states that "the parties have previously agreed generally to proceed with a joint defense effort in connection with" this litigation.

FYEO contends that communications before October 11, 2002, the effective date of the agreement, are not shielded from disclosure by the joint defense privilege. In its Opposition, Calgon claims that this agreement memorializes a verbal understanding between Calgon, Product Concepts Company ("PCC"), and Schneider that existed since before this litigation began. The agreement states that it covers all privileged information exchanged or communicated between the parties or their attorneys in the past or future in connection with the joint defense efforts. Calgon also explains that its current litigation counsel represented PCC and Schneider regarding this dispute before the filing of the lawsuit.

Communications before October 11, 2002 are discoverable. The agreement explicitly states an effective date of October 11, 2002. Moreover, Calgon has not cited any authority indicating that its current counsel's previous representation of PCC and Schneider shields shared communications from disclosure without evidence of the existence of a joint defense agreement prior to October 11, 2002. Calgon bears the burden of demonstrating the existence of a joint defense agreement prior to

October 11, 2002, and it has not meet that burden. Thus, communications before October 11, 2002 are not protected from disclosure and must be produced.

FYEO contends that Calgon has not provided any declarations that a joint defense privilege was created prior to March 6, 2003. The Court concludes that Calgon has met its burden of demonstrating that a joint defense privilege existed between October 11, 2002 and March 6, 2003. The agreement states an effective date of October 11, 2002. The agreement further states that the parties had agreed generally to proceed with a joint defense effort in connection with this litigation and were merely memorializing that prior agreement on March 6, 2003. The Court has no reason to doubt this statement. FYEO has not cited any authority indicating that affidavits and declarations by Calgon are necessary to meet its burden where a written agreement signed by both parties exists.

FYEO also argues that with respect to communications that were exchanged between October 11, 2002 and March 6, 2003, Calgon has not produced evidence that the parties took any steps to ensure that those communications between them would remain confidential. With respect to confidentiality, the terms of the agreement establish that the parties took steps to ensure the confidentiality of exchanged communications. For example, the agreement explicitly provides that all privileged information exchanged or communicated between the parties or their attorneys will be "held in strict confidence." Agreement ¶ 4. The agreement also states that each party agrees to take reasonable measures to "safeguard the confidentiality" of such information. Id. ¶ 5. The agreement provides that such information has been communicated by the parties to their attorneys "in confidence." Id. ¶ 6. Finally, the agreement makes clear that neither party may use the other party's confidential information for any purpose other than the defense of the litigation without the written consent of the other party or an order from a court declaring that such information is not

subject to a valid claim of privilege. Id. ¶ 12.

FYEO also argues that Calgon and Schneider do not have the requisite identity of interest to support a joint defense privilege. To constitute a "common interest" the parties must have a strong identity of interest. McNally Tunneling Corp. v. City of Evanston, 2001 WL 1246630, *2 (N.D. Ill. Oct. 18, 2001). FYEO maintains that Calgon and Schneider have an incentive to blame one another for their wrongful acts.

Calgon and the other co-defendants in this case, PCC and its President, Schneider, have formed a partnership to sell Calgon's anti-tarnish products on QVC. Calgon states that many privileged communications between the co-defendants and their attorneys have taken place regarding the current dispute and its relationship to QVC, both prior to and after commencement of this litigation. Calgon and Schneider are both defending against claims by FYEO that they repeatedly made false allegations to QVC, FYEO's largest customer, that FYEO's product the Silver Safekeeper infringed the claims of Calgon's pending and subsequently granted patent application. Calgon and Schneider have the same interest in showing that Calgon's patent is valid, enforceable, and infringed by FYEO.

FYEO points out that Calgon and Schneider have provided conflicting statements regarding whether Schneider had authority to speak on behalf of Calgon regarding its patents. These limited statements by Calgon and Schneider do not persuade the Court that Calgon and Schneider are truly in an adversarial relationship and that the common interest doctrine cannot apply. Because the current record does not sufficiently demonstrate that Calgon and Schneider have divergent or adverse interests, the Court concludes that their interests are sufficiently aligned to bring them within the scope of the common interest doctrine.

### III.   **Prima Facie Case of Fraud**

FYEO's primary argument for piercing the attorney-client and work-product privileges rests upon its assertion that Calgon committed fraud in procurement and enforcement of the '628 patent by failing to disclose relevant prior art to the examiner. FYEO argues that Calgon intentionally concealed prior art disclosing activated carbon to prevent tarnish, the information concealed was highly material, the fraud was intentional, and the PTO, general public, QVC, and FYEO all relied upon the fraud to their detriment. FYEO identifies the allegedly concealed prior art as (1) an activated carbon cloth ("ACC") sold by Calgon's wholly-owned subsidiary Charcoal Cloth International ("CCI") and (2) a 3M product known as the 3M Silver Protector Strips ("3M Strips"). FYEO argues that this information would have been material to allowance of the claims of the '628 patent and therefore, should have been disclosed to the PTO.

A *prima facie* showing of inequitable conduct is insufficient to pierce the attorney-client privilege. In re Spalding Sports Worldwide, Inc., 203 F.3d 800 (Fed. Cir. 2000). Rather, "[t]o invoke the crime-fraud exception, a party challenging the attorney-client privilege must make a *prima facie* showing that the communication was made 'in furtherance of' a crime or fraud." Id. at 807. A finding of fraud requires "'higher threshold showings of both intent and materiality than does a finding of inequitable conduct.'" Id. (quoting Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1070 (Fed. Cir. 1998)).

A finding of common law fraud "must be based on independent and clear evidence of deceptive intent together with a clear showing of reliance. . . ." Id. (quoting Nobelpharma, 141 F.3d at 1071). The Federal Circuit has held that generally common law fraud does not exist unless the following factors are present: (1) representation of a material fact, (2) the falsity of that

representation, (3) the intent to deceive or, at least a state of mind so reckless as to the consequences that it is held to be the equivalent of intent (scienter), (4) a justifiable reliance upon the misrepresentation by the party deceived which induces him to act thereon, and (5) injury to the party deceived as a result of his reliance on the misrepresentation. Nobelpharma, 141 F.3d at 1069-70.

"Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [Patent and Trademark] Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability . . . ." 37 C.F.R. § 1.56(a). This duty extends to the inventor and the attorney or agent who prepares or prosecutes the application. 37 C..F.R. § 1.56(c). "Information is material to patentability when it is not cumulative to information already on record or being made of record in the application, and (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim. . . . " 37 C.F.R. § 1.56(b). Materiality is "judged based upon the overall degree of similarity between the omitted reference and the claimed invention in light of the other prior art before the examiner." Baxter Int'l v. McGaw, Inc., 149 F.3d 1321, 1328 (Fed. Cir. 1998).[1]

---

[1] Calgon argues that its sale of ACC was in fact disclosed to the PTO when the '628 patent was filed, and therefore, its duty of disclose was satisfied with respect to Calgon's prior sale of ACC for non-anti-tarnish uses. The sentence Calgon relies on states: "A commercial jewelry box (purchased from K-Mart Corporation) fitted with FM1-250 ACC (available from Calgon Carbon Corporation, Pittsburgh, PA) . . . ." FYEO argues that this disclosure is insufficient to inform the PTO of the prior use of ACC by Calgon for several reasons. First, FYEO states that in order to have prior art information considered by the PTO the applicant must submit an information disclosure statement ("IDS"). Calgon did not submit an IDS, let alone one disclosing the prior use of ACC. FYEO also points out that the statement Calgon relies on is in the "Testing of a Storage Case of the Present Invention" section of the patent and not in the "Background of Invention" section which describes prior art. Thus, Calgon contends, the PTO would likely conclude from the cited sentence that the ACC sold by Calgon is the subject matter of the disclosed invention and not prior art to be considered in determining patentability. FYEO also asserts that the cited sentence does not reveal the use of the ACC sold by Calgon. Finally, FYEO states that the PTO did not consider this ACC as prior art because it did not cite the ACC as prior art in the "References Cited" section of the

## A.    Prior Art

Calgon first argues that the sale and use of ACC in anti-tarnish applications does not qualify as "prior art" and thus, could not have been material to the issuance of the '628 patent. A patent claim is rendered unpatentable based on prior art if it is either anticipated or obviated by that prior art under the standards set forth in 35 U.S.C. § 102 (anticipation) and 35 U.S.C. § 103 (obviousness). Calgon asserts that under the provisions of 35 U.S.C. § 102, the ACC sold by Calgon and/or CCI for use in anti-tarnish applications does not qualify as prior art that can be used to render the '628 patent claims unpatentable for anticipation.[2] Calgon states that the ACC was never used, published, or sold by Calgon or CCI in the United States in an anti-tarnish application prior to the filing of the '628 patent application and no published information regarding the use of ACC in anti-tarnish applications was ever made available by Calgon or CCI anywhere in the world prior to the filing of the '628 patent. Calgon also states that as a wholly-owned subsidiary of Calgon, CCI had an obligation to assign its entire right, title, and interest in any inventions, patentable subject matter or other technical developments to Calgon at the time of the filing of the '628 patent application. Thus,

_____

patent. The current record and pleadings have not convinced the Court that Calgon sufficiently disclosed to the PTO that ACC was prior art. Therefore, the Court will not deny FYEO's motion on this basis.

[2] 35 U.S.C. § 102 provides:

A person shall be entitled to a patent unless –

(a)    the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for the patent, or

(b)    the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

-10-

Calgon argues, information relating to CCI's sale of ACC for use in anti-tarnish applications outside the United States cannot qualify as obviating prior art under the statutory provisions of 35 U.S.C. § 103.[3]

Calgon relies solely on the declaration of Robert McLaughlin to support the above factual assertions. See Declaration of Robert McLaughlin ¶ 3m 4. McLaughlin is currently Calgon's director of global distribution and responsible for distribution in Latin America and Canada. Id., p. 4. From February 1, 2000 until September 2001, McLaughlin was responsible for Calgon's sales activity regarding ACC throughout the world and responsible for overseeing the sales activity of ACC throughout Europe and North America by CCI. McLaughlin declaration ¶ 1. During this period, McLaughlin was responsible for managing Calgon's sales activities with respect to PreZerve jewelry boxes which are covered by the '628 patent.

FYEO argues that Calgon's reliance on McLaughlin's declaration is improper because McLaughlin's deposition testimony demonstrates that his sworn statements were based on little or no personal knowledge and were not otherwise corroborated by an independent investigation or research. The Court agrees with FYEO that McLaughlin's deposition testimony renders his declaration of limited persuasive value on the following issues: (1) whether ACC was used, published, or sold by Calgon or CCI in the United States in an anti-tarnish application prior to the filing of the '628 patent application; (2) whether published information regarding the use of ACC

_____

[3] 35 U.S.C. § 103 provides in relevant part:

(c) Subject matter developed by another person, which qualifies as prior art only under one or more of subsections (e), (f), and (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

in anti-tarnish applications was ever made available by Calgon or CCI anywhere in the world prior to the filing of the '628 patent application; and (3) whether CCI had an obligation to assign its entire right, title, and interest in any inventions, patentable subject matter or other technical developments to Calgon at the time of the filing of the '628 patent.

For example, each of McLaughlin's substantive assertions in his declaration are keyed to the date of the filing of the '628 patent application. McLaughlin either claims that something did not occur prior to that date (e.g., no publication before the filing date) or that an obligation existed as of that date (e.g. obligation to assign as of the filing date). McLaughlin admitted in his deposition, however, that he did not know the date the patent application was filed and that his declaration statements assumed that the application was filed in the fall of 2000. McLaughlin dep., pp. 32-33.[4]

McLaughlin stated in his declaration that to his knowledge, ACC was never used, published, or sold in the United States in an anti-tarnish application before the filing of the '628 patent application in March of 2000. McLaughlin Declaration ¶ 3. However, McLaughlin's responsibilities with respect to the sales of ACC did not begin until late 1999. McLaughlin did not check with anybody else at the company or determine whether any documents existed at the company that would relate to sales of ACC in the U.S. before late 1999 prior to signing his declaration. McLaughlin dep., pp. 33-34. McLaughlin admitted that as far as he knew, no investigation has been undertaken at Calgon as to whether or not activated carbon cloth was ever used, published or sold in the U.S. in an anti-tarnish application prior to the filing date on the '628 patent application. Id., p. 34.

McLaughlin's declaration further states that to his knowledge, no published information regarding the use of ACC in anti-tarnish applications was ever made available anywhere in the world

---

[4] The patent application was filed on March 22, 2000.

prior to the filing of the '628 patent application. McLaughlin explains in his declaration that certain specific sales information made available by CCI was provided to individual and prospective customers upon request. McLaughlin's declaration then references document nos. CCC 00764-00765 and CCC 0819-0822. McLaughlin conceded in his deposition that he saw one of the documents (CCC 00765) for the first time when he reviewed his declaration. McLaughlin dep., p. 26. Moreover, with respect to document nos. CCC 00764-00765, McLaughlin admitted that he did no investigation beyond his own knowledge to determine whether these documents were ever published. Id., pp. 43-44. With respect to document nos. CCC 00819-00822 also referenced in his declaration, McLaughlin testified that he saw those documents for the first time at his deposition. Id., pp. 93-94.

Finally, in his declaration, McLaughlin stated: "To my knowledge, as a wholly-owned subsidiary of [Calgon], CCI had an obligation to assign its entire right, title and interest in any inventions, patentable subject matter or other technical developments to Calgon at the time of the filing of the '628 patent application." When asked at his deposition whether he had "any idea whether or not CCI does or does not have any obligations to assign rights in inventions to Calgon Carbon," McLaughlin responded that he had "no idea." McLaughlin dep., p. 49. McLaughlin testified that he assumed that CCI had such an obligation:

> Q:    What was your basis in your declaration for saying that to your knowledge, CCI had some obligation to assign rights to Calgon Carbon?

> A:    That was just an assumption on my part that that would be a standard thing that you would do in a business relationship. I didn't investigate it, think about it or take it any further than that.

> Q:    Had you discussed this issue at all with anybody before you signed this declaration, this issue of assignment of rights?

-13-

A:    No.

Q:    So you just saw it in a declaration and sounded good to you, so you signed it?

A:    It was an assumption on my part. It was my declaration.

                                        * * *

Q:    So if I understand right, you didn't do any investigation of CCI's duties to
       assign rights when you signed this declaration, correct?

A:    That's correct.

McLaughlin dep., pp. 52-54.

Because the Court finds McLaughlin's declaration unpersuasive on the issues of whether ACC was used, published, or sold by Calgon or CCI in the United States in an anti-tarnish application prior to the filing of the '628 patent application; whether published information regarding the use of ACC in anti-tarnish applications was ever made available by Calgon or CCI anywhere in the world prior to the filing of the '628 patent application; and whether CCI had an obligation to assign its entire right, title, and interest in any inventions, patentable subject matter or other technical developments to Calgon at the time of the filing of the '628 patent, the Court rejects Calgon's argument the sale and use of ACC in anti-tarnish applications does not qualify as "prior art" to the '628 patent under 35 U.S.C. § 102 and § 103.

**B.     Materiality**

While materiality and intent to deceive are separate inquiries in the fraud analysis, these inquires overlap here because Calgon contends that the inventor failed to disclose the withheld information because he believed it was not material. Thus, the Court will address the materiality and intent issues in turn.

-14-

Calgon argues that even if CCI's sale of ACC and the 3M Strips are prior art, they are not "material" and there was no requirement to disclose them to the PTO. Calgon's argument against materiality rests on its claim that the ACC sold by CCI and the 3M Strips were not "attached" as part of an anti-tarnish enclosure for substantially surrounding a metal object. FYEO argues in response that the PTO told Calgon, and Calgon conceded, that "attachment" is not a patentable distinction over existing prior art. FYEO points out that the PTO rejected claim 6 of the patent application which contained the "attachment" limitation as being obvious over the prior art.

Calgon denies ever making any admission with respect to claim 6 and explains that it decided to cancel certain claims in order to get the '628 patent allowed, while incorporating the "attachment" limitation into all of the allowed claims. Calgon also points out that original Claim 7 of the application, which contained the "attachment" limitation by virtue of its dependence from original Claim 6, was allowed without any rejection being posed against it based on prior art and was retained essentially in its original form while being rewritten into independent Claim 17, which then became current Claim 1 of the '628 patent.

That Claim 7, which contained the "attachment" limitation by virtue of its dependence from original Claim 6, was allowed, as argued by Calgon, is not relevant to materiality. The test for materiality is not whether claims actually are patentable over withheld prior art, "but, rather, what a 'reasonable examiner would consider ... important in deciding whether to allow the application to issue as a patent.'" A.B. Dick Co. v. Burroughs Corp., 798 F.2d 1392, 1397-98 (Fed. Cir. 1986); Duro-Last, Inc. v. Custom Seal, Inc. ,321 F.3d 1098, 1107 (Fed. Cir. 2003) (stating "[t]his court has long held that whether a prior reference is material . . . is not controlled by whether that reference actually anticipates the claimed invention or would have rendered it obvious."). Thus, the fact that

-15-

the examiner did not rely on prior art to reject Claim 7 is not conclusive on the issue of materiality.

The Court finds sufficient evidence in the current record to support a finding that the omitted prior art would have been material to a reasonable examiner. The '628 invention uses "adsorbents capable of removing tarnishing agents from atmospheric air." U.S. Pat. No. 6,412,628, col. 2, lines 66-67. The patent identifies activated carbon cloth as being the preferred adsorbent. Id., col. 3, lines 5-6. The ACC sold by CCI is identical to the ACC referenced in the '628 patent claims. Calgon's patent application was prepared based on a report prepared by the inventor (the "Tramposch Report") just months before the filing date of the '628 patent. The Tramposch Report included a discussion of prior art, including a printed marketing brochure (the "CCI Brochure") prepared by Calgon's subsidiary, CCI. The marketing brochure shows that ACC was used in storage and display cases. Calgon omitted from the '628 patent application the prior art discussion of the Tramposch Report. Calgon omitted from the PTO the CCI Brochure, as disclosed in the Tramposch Report. Calgon has provided no explanation for its decision to exclude from the patent application the discussion of the prior art contained in the Tramposch Report.

The 3M Strips were also material to the patentability of the claims of the '628 patent. The 3M Strips also contain activated carbon and were sold to prevent tarnish from forming on jewelry in an enclosure, such as a jewelry box. Dr. Tramposch admitted that as of the fourth quarter of 1999, he knew of the 3M Strips which contain activated carbon to prevent tarnish from forming on a metal object in an enclosure. Tramposch dep., p. 18. Tramposch performed testing on the 3M Strips vis-à-vis the invention disclosed in the '628 patent. Id., p. 279. Tramposch believed that the 3M Strips have the very feature that the PTO considered critical to allowing the claims of the '628 patent, namely "two porous and protective layers of fabric or cloth." The only novel feature that the PTO

-16-

appeared to rely on in allowing the claims to issue was that the adsorbent was "disposed between two porous and protective layers of fabric or cloth." Tramposch testified that the 3M Strips "may" contain two porous or protective layers of fabric or cloth as required by the claims of the '628 patent. Id., pp. 208, 314. The fact that the 3M Strips disclose the very feature that the PTO relied on in allowing the claims, namely two porous and protective layers of fabric, supports the Court's conclusion that they are material to the claims of the '628 patent.

Finally, the withheld prior art seems more material than the art Tramposch disclosed to the PTO. Calgon disclosed chemical treatment or polishing to remove tarnish and adding a protective film of another stable metal to prevent tarnish. Neither of these methods uses an adsorbent attached to an enclosure or uses activated carbon. Neither method discloses the prevention of tarnish in an enclosure or discloses two porous or protective layers of fabric or cloth. Calgon has not explained why Tramposch withheld the ACC sold by CCI and the 3M Strips from the PTO while including seemingly less relevant references.

## C.    Intent

FYEO must also prove that Calgon acted with the requisite intent to deceive the PTO. FYEO need not conclusively prove fraud or submit direct evidence of intent to establish a *prima facie* showing of fraud. In re Spalding Sports Worldwide, Inc., 203 F.3d at 808. However, a mere failure to cite a reference to the PTO will not suffice to show fraud. Id; Nobelpharma, 141 F.3d at 1071.

Given the current record, FYEO has failed to present independent and clear evidence of fraudulent intent. FYEO argues that sufficient evidence exists to support a finding that Calgon made a deliberate decision to withhold the use of activated carbon to prevent the formation of tarnish from the PTO. FYEO states that Tramposch indicated in his report only two months before the '628

-17-

patent application was filed with the PTO that the prior use of ACC demonstrated that his invention was viable. FYEO points out that Calgon has provided no explanation for why this information was omitted from Tramposch's disclosure to the PTO. FYEO emphasizes that except for the discussion of the prior art, the substance of each paragraph of the Tramposch Report, from the "Introduction" to "Conclusions" sections was included in the '628 patent application. Many paragraphs were copied verbatim from the Tramposch Report into the patent application. According to FYEO, not only was the report's discussion of the prior art omitted, but it was replaced with two statements about prior art far less relevant: polishing and chemical layers.

FYEO states Dr. Tramposch was also aware of the 3M Strips and never disclosed them to the PTO during the patent prosecution. Dr. Tramposch testified that the 3M Strips were the only application of activated carbon for use in prevent tarnish in jewelry boxes of which he was aware. Tramposch dep.,pp. 18-19. FYEO again points out that Calgon has not provided an explanation for why this prior art that the inventor was allegedly aware was not disclosed to the PTO.

While it may be reasonable to infer from the above evidence that Calgon made a deliberate decision to withhold known, material references from the PTO, this is only one reasonable inference that may be drawn from the entire record. The Court finds that Tramposch's deposition testimony that he personally did not consider the withheld prior art to be material to the patentability of the '628 patent claims under the duty of disclosure set forth in 37 C.F.R. § 1.56 tends to rebut FYEO's allegation of intent. Tramposch testified that he did not believe the 3M Strips were material to the '628 patent claims because the 3M Strips did not work effectively to prevent tarnish, since they were not "attached" as part of an anti-tarnish enclosure for substantially surrounding a metal object.

Tramposch dep., pp. 273-279.[5]  Tramposch further testified that he was aware of no prior art reference which discloses the feature of "attachment." Id., pp. 276-77.

FYEO argues that Tramposch's self-serving testimony is insufficient to prove that the art was not intentionally concealed. FYEO relies on the Federal Circuit's decision in Paragon Podiatry Lab. v. KLM Labs., Inc., 984 F.2d 1182, 1186-88 (Fed. Cir. 1993) for the proposition that an expression by an inventor of his subjective intent, particularly after institution of litigation is generally of minimal value. FYEO's statement of the law appears to be less than accurate in this context. The Paragon Podiatry Lab. court held that an inventor's expression of subjective intent to experiment was generally of minimal value in the context of determining whether sales activities were sufficiently commercial to raise the on-sale bar. In contrast, on the issue of whether the assignee of the patent engaged in inequitable conduct before the PTO, the Federal Circuit made clear that all the circumstances, including those indicative of good faith, must be considered in deciding the intent to deceive element. Id. at 1189, 1190; see also GFI, Inc. v. Franklin Corp., 265 F.3d 1268, 1274 (Fed. Cir. 2001) (stating "[w]hen examining intent to deceive, a court must weigh all the evidence, including evidence of good faith.").

Because conflicting evidence exists on the intent issue, the Court must conclude in this preliminary context that FYEO has not made a *prima facie* showing of fraud necessary to pierce the attorney-client privilege. The Court emphasizes that its findings on these issues are not final and must be viewed in the preliminary context in which they are made. Although evidence yet to be introduced may cast a different light on these issues, the current record suggests the materiality of

---

[5] The ACC sold by Calgon and/or CCI and the 3M Strips can only be inserted into the enclosure by the user without any means of attachment thereto.

-19-

the withheld art but a good faith argument by Calgon. Tramposch's testimony casts doubt on his intent to commit fraud on the PTO and precludes an independent and clear finding of fraudulent intent. On a complete record, Calgon may prove that the withheld information was not material and FYEO may show that the attachment distinction highlighted by Calgon is so inconsequential that it cannot reasonably argue that Tramposch acted in good faith.

IV.    **Waiver**

Lastly, FYEO argues that Calgon has waived its attorney-client privilege due to its selective disclosure of privileged communications by submitting declarations of two attorneys involved in the drafting and prosecution of the '628 patent application. FYEO claims that these declarations describe the communication between the attorneys and Calgon concerning prior art. In a four paragraph declaration, Toan Vo, the attorney who drafted an invention disclosure for the patent application which matured into the '628 patent, stated that he has no recollection of ever discussing or observing the existence of the 3M Silver Protector Strips or 3M Anti-Tarnish Strips at any time before, during or after his representation of Calgon in preparation and prosecution of the '628 patent application, until he was informed that this information was identified in Tramposch's deposition on January 8, 2003. Vo also declared that consequently, he had no recollection of any of the discussions he held with Calgon representatives or its attorneys during the preparation or prosecution of the '628 patent application ever involving the 3M Silver Protector Strips or 3M Anti-Tarnish Strips.

Christine Trebilcock, an attorney employed by the law firm of Cohen & Grigsby ("C&G), also submitted a declaration in support of Calgon's Opposition. In her brief declaration, Trebilcock stated that she was the only attorney from C&G that directly represented Calgon in prosecution of

the '628 patent application and is the only attorney who directly represents Calgon in reexamination of the patent. Trebilcock declared that she had no knowledge of the existence of the 3M Silver Protector Strips or 3M Anti-Tarnish Strips at any time before, during or after her representation of Calgon in prosecution of the '628 patent application, until she was informed that this information was identified during Tramposch's deposition.

FYEO argues that by submitting these declarations, Calgon seeks to use favorable privileged information as a "sword" while hiding other potentially unfavorable information behind the "shield" of privilege. FYEO asserts that Calgon cannot selectively disclose confidential information in this manner. The Court rejects FYEO's waiver argument.

Waiver of the attorney-client privilege can be either express or implied. <u>Laser Industries, Ltd. v. Reliant Technologies</u>, 167 F.R.D. 417, 446 (N.D. Cal. 1996). An implied waiver of the privilege occurs if "'[t]he party asserting the privilege acts affirmatively (2) to place the privileged communications in issue between the party seeking discovery and itself (3) such that denying the access to the communication becomes manifestly unfair to the party seeking discovery.'" <u>Id</u>. "Courts are less likely to find waiver when the statements alleged to constitute waiver do no purport to disclose the contents of a specific communication, and when the statements are 'pre-trial matters, not evidence.'" <u>Id</u>. "Courts also are less prone to conclude a waiver occurred where the statements at issue do not go beyond 'a mere denial of intent.'" <u>Id</u>.

FYEO asserts, without any citation to the record, that Vo's and Trebilcock's declarations reveal "the details of discussions with Calgon regarding disclosure of prior art." The Court disagrees with FYEO's characterization of the record. Vo's and Trebilcock's denials of knowledge of the 3M Strips prior to the deposition of Tramposch do not disclose the contents of specific communications

-21-

and do not go beyond "mere ` denial[s]." Id. Moreover, their denials have not placed the contents

of any privileged communications "in issue" because the Court's ruling on FYEO's current motion

is not affected by evidence about the knowledge or intentions of Calgon's patent counsel. Id.

Because counsel's denials of knowledge of the 3M Strips prior to the deposition of Tramposch has

brought Calgon no advantage in resolution of this motion, it would not be unfair to FYEO to deny

it access to Calgon's communications. Id.

### CONCLUSION

For the reasons explained above, Plaintiff For Your Ease Only Inc's Motion to Compel

Production of Documents is granted in part, denied in part, and reserved in part.


**E N T E R:**

Nan R. Nolan

**Nan R. Nolan**
**United States Magistrate Judge**


**Dated:** 4/24/03